886 A.2d 606

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Randy A. WEISS.

Misc. Docket AG No. 15, Sept. Term, 2004.

Court of Appeals of Maryland.

Nov. 22, 2005.

532

Glenn M. Grossman, Deputy Bar Counsel (Melvin Hirshman, Bar Counsel, Atty. Grievance Com'n of MD), for Petitioner.

Abbe David Lowell, Washington, DC, for Respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, Judge.

Bar Counsel, on behalf of the Attorney Grievance Commission, petitioner, pursuant to Maryland Rule 16–773(b),[1] filed a Petition for Disciplinary or Remedial Action against Randy A. Weiss, respondent, for violation of the Maryland Rules of Professional Conduct (MRPC).[2] The petition alleged that the respondent violated MRPC 8.4 sections (b), (c) and (d)[3] by converting funds due to his law firm in fifty-four separate transactions from 1993 to 1996, in the total amount of $676,465.99.

In accordance with Maryland Rule 16–752(a)[4] this Court assigned the matter to Judge Louise G. Scrivener of the

---

1. Maryland Rule 16–773(b) provides:
 "(b) **Petition in Court of Appeals.** Upon receiving and verifying information from any source that in another jurisdiction an attorney has been disciplined or placed on inactive status based on incapacity, Bar Counsel may file a Petition for Disciplinary or Remedial Action in the Court of Appeals pursuant to Rule 16–751(a)(2). A certified copy of the disciplinary or remedial order shall be attached to the Petition, and a copy of the Petition and order shall be served on the attorney in accordance with Rule 16–753."

2. This Court adopted a new version of the Maryland Lawyer's Rules of Professional Conduct, effective 1 July 2005. The MRPC sections applicable to this case are identical to the sections they replaced.

3. MPRC 8.4 provides:
 "**Rule 8.4. Misconduct.**
 It is professional misconduct for a lawyer to:
 . . .
 (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]
 (d) engage in conduct that is prejudicial to the administration of justice" (alteration added).

4. Maryland Rule 16–752(a) states:
 "(a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for

Circuit Court for Montgomery County for an evidentiary hearing and to make findings of fact and conclusions of law. In accordance with Maryland Rule 16–757,[5] Judge Scrivener held a hearing and issued findings of fact and conclusions of law. There is no dispute as to the facts of this case and neither party filed exceptions to Judge Scrivener's findings.

## I. Facts

Respondent was admitted as a member of the Bar of this Court on May 1, 1982. He maintained an office in Washington, D.C. for the practice of law and presently works in the same firm in the position of a legal clerk. The Petition for Disciplinary or Remedial Action is based upon the District of Columbia Court of Appeals' finding that respondent violated the rules of professional conduct of that jurisdiction when he converted funds belonging to his law firm. That court suspended him from the practice of law in the District of Columbia.

Judge Scrivener's findings of fact and conclusions of law are as follows:

"At the hearing it was determined that the underlying facts leading to the suspension of Respondent, Randy A. Weiss, by the District of Columbia Court of Appeals are not in dispute. Also not in dispute are certain remedial actions taken by respondent both before and after the hearing before the District of Columbia Court of Appeals Board on Professional Responsibility, which made Findings of Fact relied upon by the District of Columbia Court of Appeals.

---

maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing."

5. Rule 16–757 provides in pertinent part:
"(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law."

## "FINDINGS OF FACT

"These findings of fact are based upon the undisputed Findings of Fact of the District of Columbia Board on Professional Responsibility, Respondent's Designation of Documents, and argument by counsel.

"1. Respondent was admitted to the District of Columbia Bar in December 1981. He also is a member of the Maryland, Virginia, Florida, and Colorado Bars. Respondent has not been subject to any prior disciplinary proceedings.

"2. At the time of the conduct at issue here, Respondent was a partner in the law firm [ ] (the 'Firm'), where he specialized in real estate, refinancings, and real estate settlements. Respondent was also a licensed underwriting title attorney and serves as an agent for title insurance companies represented by the Firm.

"3. The misconduct found concerns the conversion of funds owed to the Firm as a result of Respondent's involvement as title insurance agent on real estate transactions. When Respondent served as counsel to a party in a transaction involving the sale of real property, his Firm was paid a fee for his work. The fee would be reflected on the settlement sheet summarizing the payments involved in the transaction. On some, but not all, real estate sale transactions on which he performed legal work, Respondent also served as the title insurance agent. On such transactions, Respondent was compensated by the title insurance company through the insurance premiums paid by the entity acquiring the insurance. These payments also were reflected on the settlement sheet. Under the agreements with the title insurance companies, Respondent retained 80% of the premium and 20% was passed on to the insurance company to cover the risk. Because the premiums were based on the selling price of the real estate, in large commercial transactions the amount was substantial. Respondent acknowledges that all of the legal fees and title insurance fees paid to Respondent were due and payable to the Firm.

"4. Starting in April, 1993, Respondent converted a portion of the title insurance fees in a number of transactions he handled to his own money market account. The record is not clear as to precisely how Respondent diverted the funds, since he indicated that at times checks were made payable to him personally, while other evidence indicates that the funds were placed in a Firm escrow account over which Respondent had effective control. Respondent further testified that, on several occasions, he deposited the title insurance fees into his own professional corporation operating account. The checks from the Firm were signed by Respondent and/or one of Respondent's partners in the Firm. During the period from 1993 to 1996, Respondent paid to the Firm the legal fees that resulted from the real estate transactions but retained for himself the title insurance fees in approximately one third of the transactions. The Firm's account receivable system did not tie into the system that produced the settlement sheets and title insurance premiums are negotiable and, therefore, vary by transaction. So, for example, on a real estate sale transaction on which Respondent performed legal work and served as the title insurance agent, if Respondent turned over to the Firm the check for the legal fees, the Firm would not detect a shortfall if Respondent simply kept a portion of the check for the title insurance fee. The Respondent testified that there was never a time that he took the entire title insurance premium for himself. The Respondent always gave the firm some of the premium and, according to the Respondent's testimony, the firm was 'not able to determine, because of the volume of work, whether or not [he was] gypping them on that, whether or not [he was] not turning over the correct amount.' [Brackets in original.]

"5. Respondent took funds due to the Firm a total of 54 times from April 1993 through September 1996. The amounts covered ranged significantly, from under $1,000 to $128,745.21. According to the report of an auditor the Firm retained to examine Respondent's activities, the total con-

verted equaled $676,465.99. None of the funds involved client funds; they were all funds due to the Firm.

"6. Respondent placed the converted funds in a money market account and paid taxes on the funds. The money market account in which Respondent deposited these funds also contained funds from other sources. Respondent stated that he never spent the money he diverted, although, it is not clear from the record [that] the Respondent was aware of the full amount taken. The Respondent testified that he was unable to readily identify the total amount that had been diverted from the firm as the account into which the diverted funds were deposited also contained other funds and from at least one of those accounts, withdrawals were made for living or other purposes.

"7. The record shows that he did not use the funds to change his lifestyle. He remained in the same house, drove the same car, took the same vacations and otherwise continued to live as he had prior to taking the money. His wife continued to work at the job she had prior to Respondent's conversion of funds. He, however, was secretive about the funds, and did not disclose to his wife the existence of the money market account. There is no evidence that Respondent has a drug, alcohol, or gambling addiction.

"8. After the Jewish High Holidays in 1996, Respondent began to come to terms with his conduct and why it was wrong. Respondent was an adult Bar Mitzvah in 1996, and has involved himself increasingly as an adult in the religious aspects of his Jewish heritage. After consultation with his Rabbi, in May 1997 he advised his Firm, through counsel, of his conversion of funds. The Firm was unaware of Respondent's misconduct. Respondent also suggested that the Firm advise D.C. Bar Counsel. Upon learning of his conduct, the Firm retained an accountant, paid for by Respondent, to audit the relevant books and an outside counsel to advise the Firm. On May 27, 1997, Respondent and the Firm advised Bar Counsel of Respondent's misconduct.

"9. When Respondent advised the Firm of his diversion of funds, he expressed his intention to return the money.

He believed, based on his own limited review of his records, that he had taken between $300,000 and $450,000. He immediately returned $450,000 to the Firm in May 1997, pending the audit results. The audit revealed, however, that he had taken an additional $226,465.99, which Respondent promptly paid in August and October 1997. He also paid for the costs of the audit and the fees of the Firm's outside counsel. Respondent also did not retain the 17.2% to which he would have been entitled as his partner share if he had paid the money into the Firm initially.

"10. After advising the Firm of his conversion of funds, Respondent was instrumental in revising the Firm's financial practices to reduce the risks that similar conduct might occur again. Respondent insisted the Firm adopt a two-signature practice for checks and took the steps necessary to make that change when others in the Firm were slow to do so. Respondent no longer has check signing authority with the Firm.

"11. In January 1998, as the result of the events, Respondent ceased to be a partner in the Firm. He has remained associated with the Firm since the day he gave notice to his partners. . . .

. . .

"13. According to the Report of Dr. Thomas C. Goldman, a psychiatrist retained by Respondent, Respondent's decision to confess voluntarily of his offenses is rooted in his discussion with his Rabbi and his 'sense of himself as a religious man.' Respondent claims, supported by his Rabbi and both of the psychiatrists who examined him, that he has fully accepted responsibility for his misdeeds, is sincere in his desire to make amends, and has taken meaningful steps to avoid repeating his admittedly wrongful conduct. Beginning in 1997, Respondent undertook personal psychotherapy with Ralph Barocas, Ph.D. and has voluntarily placed himself under the professional supervision of [the Firm's managing partner].

"14. The reports of D.C. Bar Counsel's psychiatrist, Dr. Richard A. Ratner, and Respondent's psychiatrist are basi-

cally consistent. Both stated that Respondent suffers from no mental disease or illness. Both relate Respondent's conversion of funds to a psychological need for security borne of his father's depression-era fear of poverty. Because of psychological ties to his father, Respondent felt that it was his responsibility to help others in his family, including his parents, his older brother who suffers from schizophrenia, and his sister. Both psychiatrists describe Respondent as someone who could not say no and is overly solicitous towards friends. His willingness to help his family has been a cause of friction in his marriage as has his secrecy in financial matters, particularly with respect to the funds at issue here.

"15. D.C. Bar Counsel's psychiatrist, Dr. Ratner, summarized:

'I find it impossible to avoid the conclusion that Mr. Weiss' misdeeds represent an extended period of acting out of his psychological conflicts. Mr. Weiss, though on the surface a stable member of the community and his profession, was clearly beset by conflicting emotions within himself and conflicting claims on his loyalties and his resources by his family.' [Indentation and numbering in original.]

"Both psychiatrists also state that Respondent has made significant changes in his life since he took the funds and both indicated that it was unlikely that he would repeat these misdeeds. Dr. Ratner stated in his report that Respondent has learned to say no and to place more confidence in others, which has made him more secure.

"15. [sic] After hearings on March 18 and May 6, 1999 before the Hearing Committee of the Board on Professional Responsibility (the 'Hearing Committee'), the Committee determined that Respondent had violated the rules as charged. The D.C. Bar Counsel initially sought a suspension of six months based upon Respondent's voluntary disclosure, remorse, cooperation, restitution, and rehabilitation. Thereafter, the Committee issued its recommendation that Respondent be suspended for one year, with no fitness

requirement, and then be placed on two years of probation with conditions. The full D.C. Board of Professional Responsibility ('the Board') considered the matter and recommended Respondent be suspended for three years with one year suspended in favor of probation for a period of two years or until his therapist advises the D.C. Bar Counsel that therapy is no longer necessary. The Board did not impose any additional conditions for reinstatement to the Bar. The District of Columbia Court of Appeals then considered the matter and adopted the recommendation of the Board and ordered that Randy A. Weiss, be suspended from the practice of law for a period of three years, with one year suspended in favor of probation for a period of two years or until his therapist concludes that therapy is no longer necessary, for illegally taking funds from his law firm. The suspension does not require a showing of fitness. Judge Ruiz dissented and noted the unusual facts of the Respondent's case.

. . .

"17. After his voluntary disclosure, Mr. Weiss sought counseling from psychotherapist, Dr. Ralph Barocas. In relation to the charges brought by D.C. Bar Counsel, Mr. Weiss sought an independent psychiatric evaluation by Dr. Thomas Goldman, who concluded that while Mr. Weiss 'does not suffer from a major mental illness or from a substance abuse disorder, he does suffer from a significantly neurotic personality disorder which provides a basis for understanding both his offenses and his need for self-examination and personal growth.' Dr. Goldman opined that 'at the time of his commission of the offenses with which he is charged, he was acting under a sense of compulsion without any understanding of his own unconscious appreciation of the enormous self-destructive risk he was undertaking.'

"18. The psychiatrist for D.C. Bar Counsel, Dr. Richard Ratner, reported that 'though the illegal diversion of funds took place over a very substantial period of time, the entire episode would appear to be an aberration in the context of Mr. Weiss's life.'

"19. Mr. Weiss's actions would likely not have been discovered if he had not come forward to inform his Firm and D.C. Bar Counsel of his conduct.

. . .

"22. Mr. Weiss has been cooperative with the Attorney Grievance Commission of Maryland and the Office of Bar Counsel. . . .

. . .

"26. The United States Court of Appeals for the District of Columbia, the United States Court of Appeals for the Federal Circuit, the Virginia State Bar Disciplinary Board, the Supreme Court for the State of Colorado, and the United States District Court for the District of Maryland imposed a sanction reciprocal to the discipline imposed by the D.C. Court of Appeals.[6] . . .

## "FINDINGS OF LAW

"1. Respondent's conduct violated the following provisions of the Maryland Rules of Professional Conduct:

"(i) Rule 8.4(b), in that Respondent committed a criminal act (theft) that reflects adversely on his honesty, trustworthiness, or fitness of a lawyer in other respects; and

(ii) Rule 8.4(c), in that Respondent engaged in conduct involving dishonesty, fraud, deceit, and/or misrepresentation." [Alterations added.] [Citations omitted.]

Because the facts of this case are undisputed, and the parties did not file exceptions, we are left to determine the proper sanction for respondent's violation of the MRPC.

After Judge Scrivener's findings of fact and conclusions of law, respondent and petitioner filed recommendations for sanctions pursuant to Rule 16–758(b).[7] Respondent asks us to

---

6. The Supreme Court of Florida has also imposed a sanction reciprocal to the discipline imposed by the D.C. Court of Appeals.

7. That rule provides:

impose a sanction reciprocal to the District of Columbia Court of Appeals' sanction. He argues that such a result is warranted because the District of Columbia Court of Appeals and this Court share identical goals in discipline, that the District of Columbia Court of Appeals carefully considered all the mitigating circumstances, and that, as a matter of public policy, attorneys should be encouraged to self-report wrongful conduct.

Petitioner, on the other hand, asks for disbarment. It is undisputed that, over a period of three years and in fifty-four separate transactions, respondent stole over $670,000 from his law firm violating Rules 8.4(b) and (c). Petitioner argues that, although we ordinarily give deference to the decisions of the court of original jurisdiction in reciprocal discipline cases, this Court's pronouncements concerning misappropriation and theft require substantially different discipline in this case. We agree.

## II. Standard of Review

It is clear that "[t]his court has original and complete jurisdiction over attorney disciplinary proceedings." *Attorney Grievance Comm'n v. Tayback,* 378 Md. 578, 585, 837 A.2d 158, 162 (2003); *Attorney Grievance Comm'n v. Blum,* 373 Md. 275, 293, 818 A.2d 219, 230 (2003); *Attorney Grievance Comm'n v. Harris,* 371 Md. 510, 539, 810 A.2d 457, 474 (2002); *Attorney Grievance Comm'n v. White,* 354 Md. 346, 354, 731 A.2d 447, 452 (1999); *Attorney Grievance Comm'n v. Gavin,* 350 Md. 176, 189, 711 A.2d 193, 200 (1998); *Attorney Grievance Comm'n v. Adams,* 349 Md. 86, 93, 706 A.2d 1080, 1083 (1998); *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 473 (1996); *Attorney Grievance Comm'n v. Kent,* 337 Md. 361, 371, 653 A.2d 909, 914 (1995);

---

"**Rule 16–758. Post–hearing proceedings.**

. . .

(b) **Exceptions; recommendations.** Within 15 days after service of the notice required by section (a) of this Rule, each party may file (1) exceptions to the findings and conclusions of the hearing judge and (2) recommendations concerning the appropriate disposition under Rule 16–759(c)."

*Attorney Grievance Comm'n v. Powell,* 328 Md. 276, 287, 614 A.2d 102, 108 (1992). We conduct an independent review of the record and "determine whether the findings of the hearing judge are based on clear and convincing evidence." *Tayback,* 378 Md. at 585, 837 A.2d at 162; *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 388, 794 A.2d 92, 100 (2002); *Attorney Grievance Comm'n v. Alison,* 349 Md. 623, 629, 709 A.2d 1212, 1214–15 (1998) (quoting *Attorney Grievance Comm'n v. Kemp,* 335 Md. 1, 9, 641 A.2d 510, 514 (1994)).

In reciprocal discipline cases, the findings of fact and conclusions of law in the original jurisdiction are conclusive evidence of an attorney's misconduct. Maryland Rule 16–773(g); *see Attorney Grievance Comm'n v. Scroggs,* 387 Md. 238, 249, 874 A.2d 985, 992 (2005); *Attorney Grievance Comm'n v. Ayres–Fountain,* 379 Md. 44, 56, 838 A.2d 1238, 1245 (2003); *Attorney Grievance Comm'n v. Cafferty,* 376 Md. 700, 703, 831 A.2d 1042, 1045–46 (2003). In our independent review of the record, we accept the hearing judge's findings of fact unless they are clearly erroneous. *Tayback,* 378 Md. at 585, 837 A.2d at 162; *Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 97, 797 A.2d 757, 763 (2002); *Attorney Grievance Comm'n v. Wallace,* 368 Md. 277, 288, 793 A.2d 535, 542 (2002); *White,* 354 Md. at 365, 731 A.2d at 458; *Attorney Grievance Comm'n v. Garland,* 345 Md. 383, 392, 692 A.2d 465, 469 (1997). Conclusions of law are reviewed "essentially *de novo.*" *Tayback,* 378 Md. at 585, 837 A.2d at 162; *Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002); *Attorney Grievance Comm'n v. Dunietz,* 368 Md. 419, 428, 795 A.2d 706, 711 (2002). As a result, it is this Court who decides whether a lawyer has violated the MRPC. *Tayback,* 378 Md. at 585, 837 A.2d at 162; *White,* 354 Md. at 365, 731 A.2d at 458; *Garland,* 345 Md. at 392, 692 A.2d at 469; *Attorney Grievance Comm'n v. Breschi,* 340 Md. 590, 599, 667 A.2d 659, 663 (1995).

### III. Discussion

Respondent admits that he has violated the provisions of MRPC 8.4 sections (b) and (c). The only issue in dispute is

the extent of the sanction to be imposed. In answering this question we must balance our tendency to follow the original jurisdiction's sanction under our reciprocal discipline doctrine, against our prior cases and the sanctions imposed upon members of this Bar for similar misconduct committed in this jurisdiction, always with a view towards the protection of the public.

### A. Reciprocal Sanctions

The Maryland Constitution has vested this Court with the power to "adopt rules and regulations concerning the practice and procedure in and the administration of the appellate courts and in the other courts of this state." Md. Const. art. IV, § 18(a). Pursuant to that power this Court adopted Maryland Rule 16–773 governing reciprocal discipline. That rule provides in pertinent part:

"(e) **Exceptional circumstances.** Reciprocal discipline shall not be ordered if Bar Counsel or the attorney demonstrates by clear and convincing evidence that:

. . .

(3) the imposition of corresponding discipline would result in grave injustice; [or]

(4) the conduct established does not constitute misconduct in this State or it warrants substantially different discipline in this State"

In determining what constitutes grave injustice or if the conduct warrants substantially different discipline in this State we turn to our reciprocal discipline cases.

It is a well established principle in this State that this Court is "inclined, but not required, to impose the same sanction as that imposed by the state in which the misconduct occurred. We are required to assess for ourselves the propriety of the sanction imposed by the other jurisdiction and that recommended by the Commission." *Scroggs*, 387 Md. at 254, 874 A.2d at 995 (citations omitted); *see also Attorney Grievance Comm'n v. Steinberg*, 385 Md. 696, 704 n. 9, 870 A.2d 603, 608 n. 9 (2005) (stating that " '[w]e are prone, but not

required, to impose the same sanction'") (citations omitted); *Ayres–Fountain,* 379 Md. at 57, 838 A.2d at 1246; *Cafferty,* 376 Md. at 727, 831 A.2d at 1058 (stating that "[w]e tend to, but are not required to, impose the same sanction") (citations omitted); *Attorney Grievance Comm'n v. Roberson,* 373 Md. 328, 355, 818 A.2d 1059, 1076 (2003); *Attorney Grievance Comm'n v. McCoy,* 369 Md. 226, 236, 798 A.2d 1132, 1137–38 (2002) (stating that "[t]his Court has often imposed sanctions, in reciprocal discipline cases, of facially equal severity to those imposed by a sister state. We have pointed out, however, that there is no requirement that this should be done") (citations omitted); *Attorney Grievance Comm'n v. Ruffin,* 369 Md. 238, 253, 798 A.2d 1139, 1148 (2002); *Attorney Grievance Comm'n v. Dechowitz,* 358 Md. 184, 192, 747 A.2d 657, 661 (2000); *Attorney Grievance Comm'n v. Richardson,* 350 Md. 354, 371, 712 A.2d 525, 533 (1998); *Attorney Grievance Comm'n v. Sabghir,* 350 Md. 67, 83, 710 A.2d 926, 934 (1998); *Attorney Grievance Comm'n v. Gittens,* 346 Md. 316, 325, 697 A.2d 83, 88 (1997); *Attorney Grievance Comm'n v. Willcher,* 340 Md. 217, 221–22, 665 A.2d 1059, 1061 (1995); *Attorney Grievance Comm'n v. Saul,* 337 Md. 258, 267, 653 A.2d 430, 434 (1995). The fact that we are "inclined," "prone," or "tend to" and "often" impose the same sanction is not determinative in this case. The explicit reluctance of the Court to adopt a blanket rule of reciprocity provides that we must look at each case individually and decide whether to deviate from the original jurisdiction's sanction, and in this case we do so.

 In most reciprocal discipline cases, we have held that, *ordinarily,* when the purpose for the discipline in the original jurisdiction is congruent with ours, we follow the original jurisdiction's sanction. In Maryland "[t]he purpose of the sanction imposed on an attorney following disciplinary proceedings is to protect the public rather than to punish the attorney...." *Steinberg,* 385 Md. at 703, 870 A.2d at 607; *Attorney Grievance Comm'n v. Sperling,* 380 Md. 180, 191, 844 A.2d 397, 404 (2004); *Ayres–Fountain,* 379 Md. at 58, 838 A.2d at 1246; *Cafferty,* 376 Md. at 727, 831 A.2d at 1059; *Roberson,* 373 Md. at 356, 818 A.2d at 1076; *Attorney Griev-*

*ance Comm'n v. DiCicco,* 369 Md. 662, 686, 802 A.2d 1014, 1027 (2002); *McCoy,* 369 Md. at 237, 798 A.2d at 1138; *Ruffin,* 369 Md. at 254, 798 A.2d at 1148; *Dechowitz,* 358 Md. at 192, 747 A.2d at 661; *White,* 354 Md. at 365, 731 A.2d at 458; *Gittens,* 346 Md. at 325, 697 A.2d 83, 88 (1997). We often find that most jurisdictions have the same purpose and yield to their determinations because they do not view the misconduct as of any lesser importance than we do. *See Steinberg,* 385 Md. at 704 n. 9, 870 A.2d at 608 n. 9; *Ayres–Fountain,* 379 Md. at 58, 838 A.2d at 1246; *Cafferty,* 376 Md. at 727, 831 A.2d at 1059. It is our duty, however, to ensure that this purpose is properly served. In upholding that duty

> " 'we have recognized that the public interest is served when this Court imposes a sanction which demonstrates to members of the legal profession the type of conduct that will not be tolerated.... Moreover, such a sanction represents the fulfillment by this Court of its responsibility "to insist upon the maintenance of the integrity of the bar and to prevent the transgression of an individual lawyer from bringing its image into disrepute." ... Therefore, the public interest is served when sanctions designed to effect general and specific deterrence are imposed on an attorney who violates the disciplinary rules....' "

*Sperling,* 380 Md. at 191, 844 A.2d at 404 (quoting *Attorney Grievance Comm'n v. Myers,* 333 Md. 440, 447, 635 A.2d 1315, 1318 (1994)); *see also White,* 354 Md. at 365, 731 A.2d at 458. In *Attorney Grievance Comm'n v. Parsons,* 310 Md. 132, 142, 527 A.2d 325, 330 (1987) this Court stated:

> "When the Court considers the appropriate sanction in a case of reciprocal discipline, we look not only to the sanction imposed by the other jurisdiction but to our own cases as well. The sanction will depend on the unique facts and circumstances of each case, but with a view toward consistent dispositions for similar misconduct."

This standard is in agreement with our duty to protect the public, gives appropriate deference to our sister jurisdictions and ensures that every member of the Maryland Bar is subject to the same sanctions for similar conduct. Although,

"a view toward consistent dispositions for similar misconduct" [8] is an important part of this equation, a proper review of our own cases is just as important in order to ensure that all members of the Maryland Bar are subject to the same standards. It is conceivable that adopting a strict reciprocal discipline policy, in some instances, would result in grossly unfair results and might encourage some Maryland attorneys to turn themselves in to the disciplinary authorities of other jurisdictions where they are a member of the bar, to avoid the results of direct action by Maryland's processes.

In reciprocal discipline cases where we impose the original jurisdiction's sanction, we usually find that the same discipline would be given in Maryland. In *Willcher*, for example, an attorney was appointed to represent an indigent defendant. *Willcher*, 340 Md. at 220, 665 A.2d at 1060. The attorney demanded that the defendant pay $1,500.00 for the representation. Such conduct was prohibited in the District of Columbia and as a result he was disbarred. In that case, we agreed with the District of Columbia that such conduct constituted a fraud upon the indigent client and the judicial system and we disbarred the attorney stating that "[t]his Court has consistently stated that offenses infected with fraud, deceit, and dishonesty will result in disbarment in the absence of evidence of compelling reasons to the contrary." *Id.* at 222, 665 A.2d at 1061. In cases involving theft or misappropriation of client funds we have reciprocally disbarred attorneys after finding that such conduct results on disbarment in this State. *Roberson*, 373 Md. at 357, 818 A.2d at 1077; *Cafferty*, 376 Md. at 728, 831 A.2d at 1059. *See also Attorney Grievance Comm'n v. Moore*, 301 Md. 169, 171, 482 A.2d 497, 498 (1984) (holding that disbarment, the sanction imposed in the District of Columbia, was the appropriate sanction for misappropriation of client funds for Maryland attorneys); *Attorney Grievance Comm'n v. Bettis*, 305 Md. 452, 455, 505 A.2d 492, 493 (1986)

---

**8.** We have interpreted this language to mean that attorneys being disciplined should be able to expect similar sanctions for the specified offense.

(holding that, in the absence of extenuating circumstances, disbarment is the appropriate sanction for misappropriation of funds where the District of Columbia had imposed the same sanction).

In some cases, on the other hand, we have yielded to the original jurisdiction when we might have imposed a different sanction had the proceedings originated in this jurisdiction. *See Ayres–Fountain,* 379 Md. at 59, 838 A.2d at 1247; *Gittens,* 346 Md. at 327, 697 A.2d at 88–89. In *Ayres–Fountain,* an attorney filed Certificates of Compliance with the Delaware Supreme Court. The Certificates falsely stated that the attorney had timely filed and paid all taxes. The attorney was suspended from the practice of law in Delaware. In applying the same sanction imposed by the Delaware court we held that

"where a respondent's most serious misconduct involves misrepresentations, and those misrepresentations are to the Supreme Court of the State in which he or she principally practices and that sanctioned him or her, it ordinarily is appropriate to defer to that court, notwithstanding that the sanction it imposed is not identical to the one that may have been imposed by this Court were the same conduct to have occurred in this State."

*Ayres–Fountain,* 379 Md. at 59, 838 A.2d at 1247. In another case, an attorney convicted for the theft of $88,837.92 from client's funds entrusted to him was suspended by the District of Columbia Court of Appeals. *Gittens,* 346 Md. at 322, 697 A.2d at 86.[9] We imposed the same sanction acknowledging that we may have decided differently as the original jurisdiction had the misconduct occurred in Maryland. *Id.* at 327, 697 A.2d at 89. In adopting the District of Columbia's sanction, we said:

---

**9.** We distinguished *Gittens* in *Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 413–14, 773 A.2d 463, 485 (2001), stating that *Gittens* was a reciprocal discipline case and it did not apply to an original misappropriation case like *Vanderlinde. Id.* at 413, 773 A.2d at 484–85. With this decision we decline to follow further the reasoning in *Gittens.*

"There is no basis for supposing that the District of Columbia treats these matters less seriously or wholly inconsistently with the manner exercised by this Court. On the contrary, deference should be paid to the District of Columbia Court of Appeals as demonstrated by the fact that it is loath to mitigate misconduct on the basis of drug or other substance addiction or abuse."

*Id.* at 327, 697 A.2d at 88. We did not provide any more guidance as to which factors were considered by the Court in making that determination. Since that time, however, we have become much less lenient towards any misconduct involving theft, misappropriation, fraud, or deceit.

It is appropriate to address some occasions where we have declined to follow the original jurisdiction's sanction. In *Parsons*, 310 Md. at 142, 527 A.2d at 330, an older 1987 case, two attorneys were suspended from practice in the District of Columbia for six months. We imposed a less severe sanction finding that, in Maryland, their conduct only warranted a 90–day suspension. *Id.* The attorneys in that case forged [10] a client's signature on a complaint for divorce, they then notarized the complaint and filed it with the court in the District of Columbia. The Court did not follow the District of Columbia's sanction because a Maryland case on point and decided a year earlier, sanctioned such conduct with only a 90–day suspension.[11]

When the conduct is more serious, we sometimes have not followed the original jurisdiction and have imposed more severe sanctions. In a post *Gittens* case, *Attorney Grievance Comm'n v. Dechowitz*, 358 Md. 184, 747 A.2d 657 (2000) (per curiam), the Supreme Court of California suspended an attor-

---

**10.** The Court noted that, although the attorneys forged the signature, they were not prosecuted or convicted of criminal forgery.

**11.** In *Attorney Grievance Comm'n v. Maxwell*, 307 Md. 600, 516 A.2d 570 (1986), this Court "imposed a 90–day suspension on an attorney for his 'deliberate falsification of [a] notary certificate, and his knowing attestation of a false signature on a deed as genuine.' *Id.* at 604, 516 A.2d at 572." *Parsons*, 310 Md. at 142, 527 A.2d at 330.

ney when he was convicted of possession of marijuana with intent to distribute. *Id.* at 191, 747 A.2d at 660. We found that such conduct is grounds for disbarment in this State and declined to follow California's sanction. *Id.* In another post *Gittens* case, an attorney, among other infractions, gave false testimony under oath. *White,* 354 Md. at 367, 731 A.2d at 459. The United States District Court for the District of Maryland suspended Ms. White indefinitely and Bar Counsel filed a petition for reciprocal discipline. *Id.* at 351, 731 A.2d at 450. We found that giving false testimony is so serious in nature that it often warrants disbarment. *Id.* at 367, 731 A.2d at 459. We declined to impose an indefinite suspension, as imposed by the original jurisdiction, and found that disbarment was the appropriate sanction due to the serious nature of the offense. *Id.* As these cases illustrate, although we usually do not deviate from the original jurisdiction's sanction, we will do so when the conduct involved is of such nature that it would not be tolerated from any member of the Bar in this State if the conduct occurred here. As a result we now turn to the nature of the respondent's misconduct and why it leads to disbarment.

### B. Misconduct and Sanction

Theft and the misappropriation of funds is one of the most egregious breaches of an attorney's duty as a member of this Bar. To illustrate the graveness of this type of conduct we have stated:

> "[I]t is essential that all members of the legal fraternity be strongly and constantly impressed with the truism that in handling moneys and properties belonging to their clients or others that they accept them in trust and are strictly accountable for their conduct in administering that trust, so they dare not appropriate those funds and properties for their personal use. The misappropriation by an attorney of funds of others entrusted to his care, be the amount small or large, is of great concern and represents the gravest form of professional misconduct."

*Bar Ass'n v. Marshall,* 269 Md. 510, 519, 307 A.2d 677, 682 (1973). In *Attorney Grievance Comm'n v. White,* 328 Md. 412, 417, 614 A.2d 955, 958 (1992) we stated that "misappropriation of funds by an attorney 'is an act infected with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction.'" (quoting *Attorney Grievance Comm'n v. Bakas,* 323 Md. 395, 403, 593 A.2d 1087, 1091 (1991)). And in *Vanderlinde* we held:

"in cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as 'compelling extenuating circumstances,' anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the '*root cause*' of the misconduct [and] that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law, or otherwise."

*Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 413–14, 773 A.2d 463, 485 (2001) (alteration added) (emphasis added).

Since *Vanderlinde* we have continued to impress upon the Maryland Bar the importance of honesty, in particular, the handling of other people's money or property. In *Vlahos,* over a period of one year an attorney took payments from the firm's clients and kept them for himself. *Vlahos,* 369 Md. at 186, 798 A.2d at 556. We held that disbarment is the proper sanction when an attorney engages in the misappropriation of funds, regardless of the source of the money. *Id.; see also Attorney Grievance Comm'n v. Spery,* 371 Md. 560, 810 A.2d 487 (2002) (attorney was disbarred for conversion of money from his partners); *Attorney Grievance Comm'n v. Post,* 379 Md. 60, 839 A.2d 718 (2003) (attorney was disbarred for two

instances of misappropriation of funds); *Attorney Grievance Comm'n v. Goodman,* 381 Md. 480, 850 A.2d 1157 (2004) (attorney was disbarred after intentionally impersonating another attorney).

Respondent's case is similar to *Vanderlinde.* Ms. Vanderlinde's conduct took place over a period of six months, respondent's lasted three years. Ms. Vanderlinde stole $3,880.67. The respondent stole $670,465.99. Both Ms. Vanderlinde and respondent made full restitution of the funds. While Ms. Vanderlinde returned the money before being caught, respondent self-reported to his firm and the commission and he then returned the funds. They both returned the money because they realized their conduct was wrong. In this case respondent's divine afflatus was the cause of his coming to terms with his conduct and why it was wrong.

Respondent's case is also similar to *Attorney Grievance Comm'n v. Ezrin,* 312 Md. 603, 541 A.2d 966 (1988). In *Ezrin,* the attorney stole $200,000.00 from his partners over a period of three years. *Id.* at 604, 541 A.2d at 966. The attorney returned the money after his partners discovered the fraud. *Id.* As a result of the thefts in their respective cases, Ms. Vanderlinde and Mr. Ezrin were disbarred. *Id.* at 609, 541 A.2d at 969; *Vanderlinde,* 364 Md. at 419, 773 A.2d at 488.

Respondent asks us to take into consideration a number of mitigating circumstances in deciding which sanction shall be imposed. In that respect, we have clearly stated that, in theft or misappropriation cases, we will consider imposing a less severe sanction than disbarment only when "compelling extenuating circumstances" are the "root cause" of the misconduct. *Vanderlinde,* 364 Md. at 414, 773 A.2d at 486. Respondent's sole evidence of the cause of his misconduct is his alleged emotional and mental problem evidenced by the psychiatrists' testimony. These experts agree that respondent does not suffer from any specific mental disease or illness. Their only explanation for his conduct is that he had a "psychological need for security borne out of his father's depression-era fear of poverty." Respondent was a very successful lawyer able to

generate large amounts of revenue for his firm and for himself. He was able to misappropriate over half a million dollars from title insurance proceeds alone, which most likely amounted to a very small part of the firm's revenue from the real estate transactions he handled. Respondent does not claim that he was having family problems at the time or any specific hardships. In *Vanderlinde*, the attorney had a history of depression, her second marriage was falling apart, her daughter was suffering from psychological problems, she had lost her job and was unsuccessful as a real estate agent, and she began taking the money because she needed to pay her bills. We found that all those circumstances were not sufficient to meet the required "compelling extenuating circumstances" standard and Ms. Vanderlinde was disbarred. It is clear that respondent has not met his burden with respect to prior mitigating circumstances and should be disbarred.

Respondent offers a number of additional mitigating circumstances, all of which took place after his misconduct. In light of *Vanderlinde's* requirement that only "compelling extenuating circumstances" being the *"root cause"* of the misconduct will be considered in applying a lesser sanction in cases involving theft, we do not address respondent's subsequent conduct.

## IV. Conclusion

Maryland Rule 16–773 requires the application of reciprocal discipline unless there is clear and convincing evidence that such application will result in grave injustice or that the conduct warrants a different sanction in this State. There is no doubt that this Court will not tolerate theft by a member of the bar from clients, partners, or third-parties. It would be grave injustice in allowing a member of this Bar to commit such an offense and be given a lesser sanction because another jurisdiction did so, while other members of the Maryland Bar would be sanctioned more severely. The current state of the law in this State warrants substantially different discipline than that imposed by the District of Columbia for offenses of the nature extant in the instant case.

Disbarment is the appropriate sanction.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST RANDY A. WEISS.

Dissenting Opinion by BELL, C.J., which RAKER, J. joins.

BELL, Chief Judge, dissenting joined by RAKER, J.

This case is a reciprocal discipline case. *Attorney Grievance Comm'n v. Ayres–Fountain*, 379 Md. 44, 56–59, 838 A.2d 1238, 1245–47 (2003); *Attorney Grievance Comm'n v. Richardson*, 350 Md. 354, 365–66, 712 A.2d 525, 530–31 (1998); *Attorney Grievance Comm'n v. Sabghir*, 350 Md. 67, 78–79, 710 A.2d 926, 931–32 (1998); *Attorney Grievance Comm'n v. Gittens*, 346 Md. 316, 324, 697 A.2d 83, 87 (1997); *Attorney Grievance Comm'n v. Willcher*, 340 Md. 217, 221–22, 665 A.2d 1059, 1061 (1995); *Attorney Grievance Comm'n v. Saul*, 337 Md. 258, 267–68, 653 A.2d 430, 434 (1995); *Attorney Grievance Comm'n v. Hopp*, 330 Md. 177, 185–86, 623 A.2d 193, 197 (1993); *Attorney Grievance Comm'n v. Sparrow*, 314 Md. 421, 425–26, 550 A.2d 1150, 1152 (1988); *Attorney Grievance Comm'n v. Parsons*, 310 Md. 132, 142–43, 527 A.2d 325, 330 (1987); *Attorney Grievance Comm'n v. Haupt*, 306 Md. 612, 614–15, 510 A.2d 590, 591–92 (1986); *Attorney Grievance Comm'n v. Bettis*, 305 Md. 452, 455, 505 A.2d 492, 493 (1986); *Attorney Grievance Comm'n v. Moore*, 301 Md. 169, 171, 482 A.2d 497, 498 (1984); *Attorney Grievance Comm'n v. Rosen*, 301 Md. 37, 39, 481 A.2d 799, 800 (1984). Such cases arise when "[a]n attorney who in another jurisdiction (1) is disbarred, suspended, or otherwise disciplined, (2) resigns from the bar while disciplinary or remedial action is threatened or pending in that jurisdiction, or (3) is placed on inactive status based on incapacity," Maryland Rule 16–773(a), and bar counsel has filed a Petition for Disciplinary or Remedial Action in

the Court of Appeals, pursuant to Rule 16–751(a)(2). Maryland Rule 16–773(b). Reciprocal discipline cases have two, significantly interrelated aspects: an evidentiary aspect and a sanction-imposition aspect.

In reciprocal cases, "[a] final adjudication in a disciplinary proceeding by a judicial tribunal . . . that an attorney has been guilty of misconduct is conclusive proof of the misconduct in the hearing of charges pursuant to this Rule." *See* Maryland Rule 16–773(g)[1]. With the evidentiary foundation in place, the issue of the appropriateness of the sanction imposed must be addressed. As to that, this Court's jurisprudence and Maryland Rule 16–773 are instructive. Subsection (c), which requires the Court to issue a show cause order upon the filing of the petition, is a mechanism within the Rule that permits either of the parties to the proceedings to show "why corresponding discipline or inactive status should not be imposed." Maryland Rule 16–773(c). Moreover, the Rule prescribes the exceptional circumstances, which, if shown, will allow the party making the showing to avoid the reciprocal discipline. Maryland Rule 16–773(e) provides:

"(e) Exceptional Circumstances. Reciprocal discipline shall not be ordered if Bar Counsel or the attorney demonstrates by clear and convincing evidence that:

"(1) the procedure was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process;

---

1. (g) *Conclusive Effect of Adjudication.* Except as provided in subsections (e)(1) and (e)(2) of this Rule, a final adjudication in a disciplinary or remedial proceeding by another court, agency, or tribunal that an attorney has been guilty of professional misconduct or is incapacitated is conclusive evidence of that misconduct or incapacity in any proceeding under this Chapter. The introduction of such evidence does not preclude the Commission or Bar Counsel from introducing additional evidence or preclude the attorney from introducing evidence or otherwise showing cause why no discipline or lesser discipline should be imposed.

The (e)(1) and (e)(2) exceptions relate to "notice and opportunity to be heard." *See Attorney Grievance Comm'n v. Roberson*, 373 Md. 328, 344–345, 818 A.2d 1059, 1069 (2003). Maryland Rule 16–773(e)(1) requires compliance with due process, and Maryland Rule 16–773(e)(2) ensures against "infirmity of proof."

"(2) there was such infirmity of proof establishing the misconduct as to give rise to a clear conviction that the Court, consistent with its duty, cannot accept as final the determination of misconduct;

"(3) the imposition of corresponding discipline would result in grave injustice;

"(4) the conduct established does not constitute misconduct in this State or it warrants substantially different discipline in this State; or

"(5) the reason for inactive status no longer exists."

This Court's treatment of the second aspect of our reciprocal discipline process, the imposition of sanction, has been, to now, both consistent and well settled. It is:

"We are prone, see *Attorney Grievance Comm'n v. Sabghir*, 350 Md. 67, 83, 710 A.2d 926, 934 (1998); *Attorney Grievance Comm'n v. Richardson*, 350 Md. 354, 365–66, 712 A.2d 525, 530–31 (1998), but not required, see *Attorney Grievance Comm'n v. Gittens*, 346 Md. 316, 324, 697 A.2d 83, 87 (1997), to impose the same sanction as that imposed by the state in which the misconduct occurred. Indeed, the Court is duty-bound to assess for itself the propriety of the sanction imposed by the other jurisdiction and that recommended by the Commission, *Gittens*, 346 Md. at 326, 697 A.2d at 88, to look not only to the sanction imposed by the other jurisdiction, but to the particular facts and circumstances of each case, the outcome being dependent upon the latter, but with a view toward consistent dispositions for similar misconduct. *Attorney Grievance Comm'n v. Willcher*, 340 Md. 217, 222, 665 A.2d 1059, 1061 (1995) (quoting *Attorney Grievance Comm'n v. Parsons*, 310 Md. 132, 142, 527 A.2d 325, 330 (1987)); *Attorney Grievance Comm'n v. Saul*, 337 Md. 258, 267–68, 653 A.2d 430, 434–35 (1995). We ordinarily will defer to the sanctioning State when the two States' purpose in disciplining counsel is the same."

*Ayres–Fountain*, 379 Md. at 57, 838 A.2d at 1246 (quoting *Gittens*, 346 Md. at 327, 697 A.2d at 88); *Attorney Grievance Comm'n v. Ruffin*, 369 Md. 238, 253–254, 798 A.2d 1139, 1148 (2002). *See also Roberson*, 373 Md. at 355–56, 818 A.2d at 1076.

Our cases also make clear that, for sanctioning purposes, important considerations for this Court have been the location of the attorney's practice, where the misconduct actually occurred, two factors recognized as quite pertinent by other courts, *see In re Schlem*, 308 A.D.2d 220, 222, 763 N.Y.S.2d 558, 559 (N.Y.A.D.2003) ("As to the appropriate sanction, it is generally accepted that the state where respondent lived and practiced law at the time of the offense has the greatest interest in the sanction imposed ... and deference is particularly appropriate where the misconduct occurred in that state"); *Copren v. State Bar*, 64 Nev. 364, 383, 183 P.2d 833, 842 (1947) ("in the spirit and under the law of comity, we should recognize the California judgment of suspension in the instant case, as to the acts of misconduct of petitioner which occurred in California"), and the seriousness with which the other jurisdiction treats the misconduct.

In accepting the sanction imposed by the Supreme Court of Delaware in *Ayres–Fountain*, though noting that it likely was not identical to one that this Court may have imposed had the matter been initiated in Maryland, we said:

"the respondent essentially is a Delaware lawyer; that is where she lives and where she principally practices. More important, the misrepresentations upon which the petitioner principally relies are misrepresentations made to the Supreme Court of Delaware, in certifications contained in annual filings that Court requires to be made in support of its oversight of the administration of justice in that State. That Court was fully informed of the facts and circumstances of the respondent's conduct. In addition to the stipulation, which is quite detailed and explicit, not only as to the violations but with respect to the respondent's admissions, the court reviewed the Report and Recommendation of Sanction of the Board of Professional Responsibility. That Report, which accepted the facts recited in the stipulation, was prepared only after the Board conducted a hearing to determine the appropriate sanction to recommend. The Board, in addition to discussing the considerations that were

taken into account in fashioning the sanction recommendation, painstakingly analyzed the cases bearing on the proper sanction and that formed the basis for the recommendation it made.

"Having been presented with the Report and the recommendation for a three year suspension, the Supreme Court of Delaware adopted the Report and accepted the recommendation, but only after it had "considered the matter carefully." That it had a firm grasp of the facts and the gravity of the situation is shown by the court's recitation of the admissions the respondent made, noting particularly that "she falsely represented to the Delaware Supreme Court, in her Certificates of Compliance filed between 1996 and 2000, that she had timely paid all federal, state, and local payroll, gross receipts and income taxes [and] concealed her failure to pay various federal, state and local taxes from the ODC and its auditor." In addition, the court referred to the aggravating factors to which the parties stipulated, indicating that the sanction was appropriate "in light of the[ir] presence." "

379 Md. at 58–59, 838 A.2d at 1246–47. *See Gittens,* 346 Md. at 324, 697 A.2d at 88 (noting that the misconduct for which the respondent was being sanctioned occurred solely in the District of Columbia). Thus when the attorney primarily practices in another jurisdiction and there commits his misconduct, deference to the reciprocal discipline sanction is usual, *Attorney Grievance Comm'n v. Scroggs,* 387 Md. 238, 874 A.2d 985 (2005); *Attorney Grievance Comm'n v. Steinberg,* 385 Md. 696, 870 A.2d 603 (2005); *Attorney Grievance Comm'n v. Ayres–Fountain,* 379 Md. 44, 838 A.2d 1238 (2003); *Attorney Grievance Comm'n v. Roberson,* 373 Md. 328, 818 A.2d 1059 (2003); *Attorney Grievance Comm'n v. Ruffin,* 369 Md. 238, 798 A.2d 1139 (2002); *Attorney Grievance Comm'n v. Gittens,* 346 Md. 316, 697 A.2d 83 (1997), and the divergence from it, rare. *See Attorney Grievance Comm'n v. Dechowitz,* 358 Md. 184, 747 A.2d 657 (2000).[2]

---

**2.** In *Attorney Grievance Comm'n v. Dechowitz,* 358 Md. 184, 747 A.2d 657 (2000), the Court disbarred the attorney, rather than impose

That is as it should be. In *In re Zdravkovich*, 831 A.2d 964, 968–969 (D.C.2003), the Court of Appeals for the District of Columbia interpreted Rule XI, § 11(c), its equivalent to Maryland Rule 16–773(e), characterizing and rationalizing its reciprocal discipline standard as follows:

"We have adopted a rigid standard for reciprocal bar discipline cases. As already indicated, we presumptively impose identical reciprocal discipline, unless the attorney demonstrates by clear and convincing evidence that the case falls within one of five specified exceptions articulated in Rule XI, §§ 11(c). *In re Gardner*, 650 A.2d 693, 695 (D.C.1994); *In re Zilberberg*, 612 A.2d 832, 834–35 (D.C.1992). While the plain language of Rule XI, §§ 11(c) places the burden on the disciplined attorney to establish by clear and convincing evidence that a lesser sanction is warranted, the Office of Bar Counsel also has standing to object to the imposition of identical discipline, see, e.g., *In re Reid*, 540 A.2d 754, 758 (D.C.1988), and may recommend a different sanction when it believes an exception applies. *See*, e.g., *In re Berger*, 737 A.2d 1033, 1040 (D.C.1999). Such instances, however, should be rare. Underlying our strict standard in reciprocal bar discipline cases is not only the notion that another jurisdiction has already afforded the attorney a full disciplinary proceeding, but also the idea that there is merit in according deference, for its own sake, to the actions of other jurisdictions with respect to the attorneys over whom we share supervisory authority."

---

reciprocally the sanction imposed by the United States District Court for the Northern District of California Federal Court and adopted by the Supreme Court of California. *Id.* at 193, 747 A.2d at 661. Noting that the attorney's sanction grew out of his guilty plea to possession of marijuana with intent to distribute, a crime similar to one for the conviction for which this Court determined that disbarment was the appropriate sanction, *see Attorney Grievance Comm'n v. McGonigle*, 295 Md. 264, 266, 454 A.2d 365, 367 (1983), the Court decided that it was not bound to follow the California decision, concluded that the attorney had not met his burden of presenting extenuating circumstances, and adopted bar counsel's disbarment recommendation. *Id.* at 193, 747 A.2d at 661.

To like effect, *see Mississippi Bar v. Drungole,* 913 So.2d 963, 2005 WL 977004 (Miss.2005); *Copren v. State Bar,* 64 Nev. 364, 385–389, 183 P.2d 833, 843–844 (1947).

In Mississippi, reciprocal discipline is governed by Mississippi Bar Discipline Rule 13, which provides:

"When an attorney should be subjected to disciplinary sanctions in another jurisdiction, such sanction shall be grounds for disciplinary action in this state, and certification of such sanction by the appropriate authority of such jurisdiction to the Executive Director of the Bar or to the Court, shall be conclusive evidence of the guilt of the offense or unprofessional conduct on which said sanction was ordered, and it will not be necessary to prove the grounds for such offense in the disciplinary proceeding in this state. The sole issue to be determined in the disciplinary proceeding in this state shall be the extent of the final discipline to be imposed on the attorney, which may be less or more severe than the discipline imposed by the other jurisdiction."

Applying that Rule, the Supreme Court of Mississippi defers both to the factual determinations made and to the sanction imposed by another jurisdiction. In *Drungole,* it explained:

"In assessing sanctions for reciprocal attorney discipline cases, we give deference to the sanction imposed by the foreign jurisdiction. After all, this Court takes the findings of the foreign jurisdiction as conclusive evidence of professional misconduct.... In accepting the findings of the foreign jurisdiction, our focus on the due process protections afforded the attorney must never waiver. *See generally Selling v. Radford,* 243 U.S. 46, 51, 37 S.Ct. 377, 61 L.Ed. 585 (1917). An attorney who is the subject of a disciplinary complaint is entitled to fundamental due process protections throughout the course of the proceedings. *In re Rokahr,* 681 N.W.2d 100, 108 (S.D.2004). Thus, it seems only appropriate that we afford deference to the sanctions imposed by the foreign jurisdiction. If the attorney was afforded full or partial substantive and/or procedural due process in the foreign jurisdiction, then the foreign jurisdiction would have had the best opportunity to consider the testimony of the

witnesses, examine the lawyer's mental state, determine the existence of aggravating and/or mitigating factors, and assess the credibility of the witnesses."

913 So.2d at 968, 2005 WL 977004 at *4 (Miss.2005). Acknowledging that Rule 13, by its terms, does not bar the court from imposing any sanction it deems appropriate, the court was clear that "Rule 13 is not an invitation to disregard logic, reason or common sense." *Id.* at 970, 2005 WL 977004 at *6. Just as it is necessary to take "the cold record of the foreign jurisdiction as conclusive" in reciprocal attorney discipline cases, deference must also be afforded to the foreign jurisdiction's findings. "[O]nly under extraordinary circumstances should there be significant variance from a sanction imposed by the foreign jurisdiction." *Id.*

The respondent, although also admitted to practice in Maryland, Virginia, Florida and Colorado, practiced law primarily in the District of Columbia, where the firm in which he was a partner maintained an office. He was charged with violating, and was found by the judge to whom this case was assigned to have violated, Rule 8.4(b) and (c) of the Maryland Rules of Professional Conduct, i.e. to have "committed a criminal act that reflects adversely on his honesty, trustworthiness, or fitness of a lawyer" and to have "engaged in conduct involving dishonesty, fraud, deceit and/or misrepresentation." The basis for these findings was the respondent's misappropriation, over a period of time, of more than $600,000 from the law firm in which he was a partner. After extensive proceedings, during which the respondent cooperated with Bar Counsel and underwent extensive counseling and analysis, the reports of which were provided to, and extensively reviewed and considered by the District of Columbia Board on Professional Responsibility (the Board), the Board recommended to the District of Columbia Court of Appeals that the respondent be suspended from the practice of law for three years, with one year suspended, in favor of two years probation or until the respondent's therapist advises Bar Counsel that therapy is no longer required. The Court of Appeals accepted that recommendation, after a hearing and consideration of the record

made before the Board. Subsequently, the respondent received reciprocal discipline from the Supreme Courts of Florida and Colorado, the Virginia State Bar Disciplinary Board, the United States District Court for the District of Maryland, the United States Court of Appeals for the District of Columbia Circuit and the United States Court of Appeals for the Federal Circuit.

Although it has no problem with deferring to the finding of the District of Columbia Court of Appeals with respect to the misconduct to which the sanction at issue applies, and is, perhaps, even happy to do so, the majority is loath to give that court's sanction determination any consideration whatsoever. Like the Mississippi Supreme Court, I believe that the two are, and should be, inextricably related. What that court said on the subject is worth repeating:

> "[I]t seems only appropriate that we afford deference to the sanctions imposed by the foreign jurisdiction. If the attorney was afforded full or partial substantive and/or procedural due process in the foreign jurisdiction, then the foreign jurisdiction would have had the best opportunity to consider the testimony of the witnesses, examine the lawyer's mental state, determine the existence of aggravating and/or mitigating factors, and assess the credibility of the witnesses."

*Drungole,* 913 So.2d at 968, 2005 WL 977004 at *4. It also is worth repeating that six other courts, presented with the same record, have deferred to the District of Columbia Court of Appeals as to the sanction.

The majority does not dispute that the District of Columbia Court of Appeals approaches attorney discipline from the same perspective as this Court, with an eye to the protection of the public and not to punish the erring attorney. 389 Md. 531, 547, 886 A.2d 606, 615 (2005). The majority concedes that deference is the norm, "we are prone" to do so, *id.*; nevertheless, on this record, its rationale for refusing deference in this case can only be that the Court of Appeals of the District of Columbia did not exact the pound of flesh that we would have done had the matter initiated in this Court, *i.e.*, it did not

punish the respondent to the extent we think required. That is not the test.

Our Rule 16–773 contemplates, indeed, requires, that reciprocal discipline be avoided only when there are "exceptional" circumstances shown by either Bar Counsel or the respondent. The majority appears to agree, suggesting that there are such exceptional circumstances: imposing reciprocal discipline "would result in grave injustice," subsection (e)(3), and the respondent's misconduct "warrants different discipline in this State." Maryland Rule 16–773(e)(4). Rather than explain these conclusions—it is simply inconceivable to me how deference to a home state's imposition of a sanction in a reciprocal discipline case can result in a grave injustice and the majority does not even attempt to clarify the point[3]—the majority

---

**3.** In the Conclusion to the opinion, the majority opines:
> "It would be [a] grave injustice in allowing a member of this Bar to commit such an offense and be given a lesser sanction because another jurisdiction did so, while other members of the Maryland Bar would be sanctioned more severely. The current state of the law in this state warrants a substantially different discipline than that imposed by the District of Columbia for offenses of the nature extant in the instant case." 389 Md. at 555, 886 A.2d at 620.

This is hardly a demonstration of extraordinary circumstances. It is, however, perhaps a reflection and a statement by the majority of what attorney discipline, to it, has become: rather than a vehicle for the protection of the public, as our cases loudly proclaim that is its purpose, it is, more importantly, a vehicle to punish the erring attorney, to send the message forth, whether or not a lesser sanction would afford the public adequate protection. It also says a great deal about the majority's approach to comity between the various jurisdictions charged with attorney discipline.

Reciprocal discipline cases come to us with a fully developed record, after the charges against the attorney have been investigated, the attorney has been charged and, following appropriate proceedings, has been determined to have committed the misconduct charged, and the disciplinary authority, often the State's high court, after considering the facts and circumstances, including mitigating and aggravating factors, has imposed what it considers an appropriate sanction. And, because the goal of attorney discipline in the jurisdiction from which received ordinarily will be the same as in the reciprocal State, they are received, in short, having already undergone a thorough and thoughtful analysis, not simply as to the underlying conduct, but also as to the sanction necessary for the public's protection. Further analysis of the sanction by the reciprocal court is therefore not necessary to ensure the desired

simply reviews our reciprocal discipline cases, emphasizing our oft-repeated admonition that we are not absolutely bound to impose identical discipline and noting that, in many of the cases in which we imposed reciprocal discipline, we were satisfied that the same sanction would have been imposed in this State, in any event. The majority also was able to find an exception, *Attorney Grievance Comm'n v. Dechowitz*, 358 Md. 184, 747 A.2d 657 (2000), in which the Court declined to impose reciprocal discipline; two, if you count *Attorney Grievance Comm'n v. Parsons*, 310 Md. 132, 527 A.2d 325 (1987), in which we reduced, rather than increased, the length of the sanction ordered by the other jurisdiction. That the result in the other jurisdiction is not the same as that which would have been reached here does not suffice to make the situation exceptional or demonstrate that substantially different discipline is warranted in this State. If that is all that is required to demonstrate exceptional circumstances, then there is no reason for reciprocal discipline; it really is meaningless.

The majority appears to rely on *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 773 A.2d 463 (2001) to justify its refusal to defer to the District of Columbia sanction decision. That reliance is misplaced. *Vanderlinde* did not change this Court's view of lawyer misappropriation. Long before that case was decided, we were clear, and stated often in our cases, time and again, that misappropriation of client funds alone will result in disbarment in the absence of compelling extenuating circumstances. *See, e.g., Attorney Grievance Comm'n of Maryland v. Bernstein*, 363 Md. 208, 229, 768 A.2d

result, unless, of course, there are exceptional circumstances or it is supposed that this Court is, or may lay claim to being, the only court able to protect the legal consuming public from the misconduct of corrupt or misbehaving lawyers. I submit that we do not have a silver bullet, never mind the only silver bullet. As we are required to do when presented with any judgment from another State, I would have thought we would, on the basis of comity, defer to that judgment, even when it embodies a result that would not have obtained in this State. Apparently, to the majority, the need for comity in the area of attorney discipline is neither great, nor wanted. Perhaps, we would be just as well off without reciprocal discipline; of what value is it if we do not value it or use it only when it suits us to do so?

607, 618 (2001); *Attorney Grievance Comm'n v. Milliken,* 348 Md. 486, 519, 704 A.2d 1225, 1241 (1998); *Attorney Grievance Comm'n v. Williams,* 335 Md. 458, 474, 644 A.2d 490, 497 (1994); *Attorney Grievance Comm'n v. Casalino,* 335 Md. 446, 452, 644 A.2d 43, 46 (1994); *Attorney Grievance Comm'n v. Bakas,* 323 Md. 395, 403, 593 A.2d 1087, 1091 (1991); *Attorney Grievance Comm'n v. Short,* 303 Md. 317, 321, 493 A.2d 362, 364 (1985); *Attorney Grievance Comm'n v. Garson,* 287 Md. 502, 503, 413 A.2d 564, 564 (1980). *Vanderlinde* addressed, rather, what would suffice as mitigation to reduce the sanction in a misappropriation case. The majority's position is apparently that unless a misappropriation case, regardless of where originated, meets the *Vanderlinde* test for mitigating circumstances, reciprocation of a sanction less than disbarment is precluded, either because under Rule 16–773(e)(3) a "grave injustice" would result in that an attorney in a reciprocal case would receive a lesser sanction than would an attorney, under the exact same facts, in a case originating in Maryland, or because, as a result of that decision, only disbarment may be imposed as a sanction.

This Court has continually admonished, repeated in virtually every reciprocal discipline case, that we seek "consistent dispositions for similar conduct." If, as the majority's reliance on *Vanderlinde* seems to suggest, seeking consistent dispositions has greater relevance to the sanction decisions within this State [1] than does the rule of reciprocity, then one must wonder what the reason for Rule 16–773(e) is, and what the importance is of the requirement that there be a demonstration of consistency as to sanction. The answer is, of course, that the Rule contemplates a sanction decision from the receiving jurisdiction and, as important, contemplates that there will be deference paid to it, just as there is expected that deference

---

**4.** On this point, the majority acknowledges the importance of the factor requiring the assessment of the facts and circumstances, "with a view toward consistent dispositions for similar conduct," but hastens to add: "a proper review of our own cases is just as important in order to ensure that all members of the Maryland Bar are subject to the same standards." 389 Md. at 549, 886 A.2d at 616.

will be paid—and there is—to the findings of that jurisdiction as to the charged misconduct. If the sanction determination is a de novo exercise or the sanction of the receiving state may be disregarded, with impunity, then there simply is little, if any, value to a reciprocal sanctions scheme and, I submit, to a reciprocal discipline regime. If reciprocal discipline is to have any meaning in misappropriation cases, *Vanderlinde* can not be construed as the majority does. If it is so construed, I question, as I have said, the value of the reciprocal discipline rule. I wonder as well why, if the receiving State's judgment is not to be trusted on the sanction, we should accept the misconduct determination.

As indicated, the majority reviewed several of our reciprocal discipline cases in support of its analysis, some in which we imposed the same sanction as the other jurisdiction and some in which we did not. To be sure, there are cases in which we stated that the sanction from the other jurisdiction was what would have been imposed in this State had the disciplinary action initiated here and others where we made a point of stating that we were imposing reciprocal discipline, deferring to the sanction decision of the other jurisdiction. I fail to see why all of those cases are not cases in which we deferred to the other jurisdiction; consistency with the result that would obtain in any event is a reason to defer. The cases the majority cites to show that we have deviated from the reciprocal sanction do not require that we deviate in this case. In fact, they prove the point that I espouse: that this Court rarely deviates and then for exceptional reasons only.

Only one of the cases, *Dechowitz*, may actually support the majority. 358 Md. 184, 747 A.2d 657 (2000). In that case, we did impose a more severe sanction in a reciprocal case, disbarment, rather than a period of suspension. *Id.* at 193, 747 A.2d at 661. Thus, it is an exception to Rule 16–773, perhaps falling under subsection (e)(4). It is significant, however, that the attorney in that case was still on probation when this Court considered the disciplinary petition. *Id.* at 191, 747 A.2d at 661. *Attorney Grievance Comm'n v. White,* 354 Md. 346, 731 A.2d 447 (1998), is not a pure reciprocal discipline case: while

some of the misconduct committed by White occurred while she was practicing in the United States District Court for the District of Maryland, *id.* at 350–351, 731 A.2d at 450, which later sanctioned her by suspending her from practice in that court, *id.,* significant and equally serious violations occurred in Maryland and were charged here, as an initial matter. *Id.* at 354–361, 731 A.2d at 452–456. Thus, that the sanction imposed was greater than that imposed by the federal District Court can not be attributed solely to a refusal to defer to that court's sanction determination due to a belief that a substantially different sanction was warranted.

*Attorney Grievance Comm'n v. Parsons,* 310 Md. 132, 527 A.2d 325 (1987), is an unusual case. There, following a precedent set five months earlier in a non-reciprocal attorney discipline case with facts identical to those of *Parsons,* we suspended Parsons for ninety days, rather than six months, which suspension was not to run concurrently with the suspension imposed by the District of Columbia Court of Appeals. *Id.* at 143, 527 A.2d at 330. It is significant that the District's suspension had already ended; therefore, it is likely that we would have deferred, by running our suspension concurrently, had that opportunity been available.

I dissent.

Judge RAKER joins in the views expressed herein.